

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

Rachel Miller Yasser
Assistant United States Attorney
Rachel.Yasser@usdoj.gov

Suite 400
36 S. Charles Street
Baltimore, MD 21201-3119

DIRECT: 410-209-4922
MAIN: 410-209-4800
FAX: 410-962-0716

November 3, 2016

Gary E. Proctor, Esq.
8 E Mulberry St
Baltimore, MD 21202

Re:   United States v. Steven B. Boyd, Jr., Crim. No. JKB 15-401

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been **accepted by November 11, 2016**, it will be deemed withdrawn. The terms of the agreement are as follows:

### Offense of Conviction

1.   The Defendant agrees to plead guilty to Count One of the Indictment now pending against him, which charges him with Sex Trafficking of a Minor, in violation of 18 U.S.C. § 1591. The Defendant admits that he is, in fact, guilty of that offense and will so advise the Court.

### Elements of the Offense

2.   The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

   a.   The defendant knowingly;

   b.   In and affecting interstate or foreign commerce;

   c.   Recruited, enticed, harbored, transported, provided, obtained, and maintained by any means a person, or benefitted financially and received anything of value from participation in a venture which has engaged in such acts;

   d.   Knowing, or in reckless disregard of the fact, or with a reasonable opportunity to observe, that the person had not attained the age of 18 years and would be caused to engage in a commercial sex act.

1

## Penalties

3. The maximum sentence provided by statute for the offense to which the Defendant is pleading guilty is as follows: a maximum term of life imprisonment and a mandatory minimum sentence of ten (10) years pursuant to 18 U.S.C. § 1591(b)(2), followed by a maximum term of supervised release for life and a mandatory minimum term of supervised release for five (5) years pursuant to 18 U.S.C. § 3583(k), and a $250,000 fine. In addition, the Defendant must pay $100 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court shall order restitution for the full amount of the victim's losses pursuant to 18 U.S.C. §1593.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked—even on the last day of the term—and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

4. The defendant understands and agrees that as a consequence of his conviction for the crime or crimes to which he is pleading guilty, he will be required to register as a sex offender, and to keep that registration current, in the place where he resides, where he is employed, and where he is a student, pursuant to the Sex Offender Registration and Notification Act (SORNA), and the laws of the state of his residence. Failure to do so may violate the terms of his supervised release and subject him to new criminal charges pursuant to 18 U.S.C. § 2250.

## Waiver of Rights

5. The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

    a. If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

    b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

---

[1] Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

  c. If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

  d. The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

  e. If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against his. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

  f. The Defendant further waives any and all motions, defenses, probable cause determinations, objections which Defendant could assert to the indictment or to the Court's entry of judgment against the Defendant, and any imposition of sentence upon the Defendant consistent with this agreement.

  g. By pleading guilty, the Defendant will be giving up all of these rights. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

  h. If Defendant files a notice of appeal raising issues outside the terms of this plea agreement, the Defendant agrees that this case shall be remanded to the district court to determine whether Defendant is in breach of this agreement and, if so, to permit the United States to withdraw from the plea agreement.

  i. If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

  j. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The Defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

6.  The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

### Factual and Advisory Guidelines Stipulation

7.  This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto, which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors:

   a.  Pursuant to U.S.S.G. § 2G1.3(d)(1), because the offense involved more than one minor, Chapter Three, Part D (Multiple Counts) shall be applied as if the persuasion, enticement, coercion, travel, or transportation to engage in a commercial sex act, or prohibited sexual conduct of each victim, had been contained in a separate count of conviction. The guideline calculations for each group are set forth herein.

### Group 1 (Sex Trafficking of Girl 1):

| Base Offense Level | 2G1.3(a)(1) | 30 |
|---|---|---|
| Use of Computer (ads) | 2G1.3(b)(3) (B) | +2 |
| Sex act/contact | 2G1.3(b)(4) | +2 |
| Aggravating Role | 3B1.1(a) | +4 |
| | GROUP 1 SUBTOTAL | 38 |

### Group 2 (Sex Trafficking of Girl 2):

| Base | 2G1.3(a)(1) | 30 |
|---|---|---|
| Use of Computer (ads) | 2G1.3(b)(3) (B) | +2 |
| Sex act/contact | 2G1.3(b)(4) | +2 |
| Aggravating Role | 3B1.1(a) | +4 |
| | GROUP 2 SUBTOTAL | 38 |

   b.  Pursuant to Chapter Three, Part D (Multiple Counts), one unit is counted for the most serious group (Group 1) and each equally serious group (Group 2). Thus, there are 2 units and two levels are added to the highest offense level (38). **Therefore, prior to acceptance of responsibility, the base offense level is 40.**

   c.  This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office may oppose *any* adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements

4

about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty. **The adjusted offense level is therefore 38.**

       d.      Pursuant to Chapter Four, Section 4B1.5(b)(1), five units are added to the offense level determined under Chapters Two and Three, because the defendant engaged in a pattern of activity involving prohibited sexual conduct; namely, sex trafficking of minors.

       e.      **Thus, the final offense level is 43.**

8.      The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

9.      This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines, will be raised or are in dispute.

10.      The parties agree and understand that this plea agreement is being entered into prior to a full and complete forensic examination of the Defendant's computers and other electronic media. Should such examination result in evidence that the Defendant was involved in the production of child pornography or any sexual activity with a child (beyond the offenses against Girl 1 and Girl 2 charged in the Indictment) or any crime of violence, this Agreement would not prevent the United States in any way from prosecuting said offenses.

Sentencing Arguments

11.      At the time of sentencing, both parties are free to recommend a lawful sentence of imprisonment using the factors set forth in 18 U.S.C. § 3553(a). This Office agrees to cap its recommendation at twenty-five (25) years imprisonment and the Defendant agrees he will not recommend a sentence less than ten (10) years' imprisonment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant. The parties remain free to argue for any lawful period of supervised release.

12.      The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct, including the conduct that is the subject of the counts of the Indictment that this Office has agreed to dismiss at sentencing.

### Forfeiture

13. The defendant understands that the court will, upon acceptance of his guilty plea, enter an order of forfeiture as part of his sentence, and that the order will include assets directly traceable to his offense, substitute assets and/or a money judgment equal to the value of the property subject to forfeiture. Specifically, as a consequence of the Defendant's plea of guilty to Count One charging a violation of U.S.C. §1591, the court will order the forfeiture of any property, real or personal, used or intended to be used to commit or to facilitate the commission of the offense, or which constitutes or is derived from proceeds traceable to any violation of this chapter, pursuant to 18 U.S.C. § 1594. The property to be forfeited includes but is not limited to the following: the HTC smartphone seized from the Defendant at the time of his arrest in January, 2015.

14. The defendant agrees to consent to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

### Assisting the Government with Regard to the Forfeiture

15. The defendant agrees to assist fully in the forfeiture of the foregoing assets. The defendant agrees to disclose all of his assets and sources of income to the United States, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including but not limited to executing any and all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are not sold, disbursed, wasted, hidden or otherwise made unavailable for forfeiture. The defendant also agrees to give this Office permission to request and review his federal and state income tax returns, and any credit reports maintained by any consumer credit reporting entity, until such time as the money judgment is satisfied. In this regard, the defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) as well as whatever disclosure form may be required by any credit reporting entity.

### Waiver of Further Review of Forfeiture

16. The defendant further agrees to waive all constitutional, legal and equitable challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. The defendant also agrees not to challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this agreement, and will not assist any third party with regard to such challenge or review or with regard to the filing of a petition for remission of forfeiture.

## Restitution

17. The Defendant agrees to the entry of a Restitution Order for the full amount of Girl 1 and Girl 2's losses. The Defendant agrees that, pursuant to 18 U.S.C. §§ 1593, 3663 and 3663A and §§ 3563(b)(2) and 3583(d), the Court shall order restitution of the full amount of the victims' losses by the offense conduct set forth in the factual stipulation, including the greater of the gross income or value to the defendant of the victims' services or labor. The Defendant further agrees that he will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement.

## Collection of Financial Obligations

18. The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party. The Defendant will promptly submit a completed financial statement to the United States Attorney's Office, in a form this Office prescribes and as it directs. The Defendant promises that the financial statement and disclosures will be complete, accurate and truthful, and understands that any willful falsehood on the financial statement will be a separate crime and may be punished under 18 U.S.C. § 1001 by an additional five years' incarceration and fine.

## Waiver of Appeal

19. In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

   a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction.

   b. The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except that the Defendant reserves the right to appeal any term of imprisonment to the extent that it exceeds 216 months' imprisonment.

   c. Nothing in this agreement shall be construed to prevent the Defendant or

7

this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

          d.      The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Obstruction or Other Violations of Law

20.    The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, (iii) moves to withdraw his guilty plea or (iv) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

### Court Not a Party

21.    The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

22. This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Rod J. Rosenstein
United States Attorney

By: _____
Zachary A. Myers
Rachel Miller Yasser
Assistant United States Attorneys

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

11/28/16
Date

_____
Steven B. Boyd, Jr.

I am Mr. Boyd's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

11/28/16
Date

_____
Gary E. Proctor, Esq.

## ATTACHMENT A

*The undersigned parties hereby stipulate and agree that the following facts are true and accurate, and that if this matter had gone to trial, the government would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter gone to trial.*

Defendant STEVEN B. BOYD, JR., a/k/a "Gotti" (hereinafter "Boyd") was a resident of Baltimore, Maryland and was born in 1979. "Girl 1" and "Girl 2" were Maryland residents, 17 years old, who engaged in commercial sex at Boyd's direction. Boyd knew that both girls were minors at the time he trafficked them.

### IDENTIFICATION OF GIRL 1

On or about December 6, 2014, the Baltimore City Police Department (BPD) conducted an undercover enforcement operation as part of an investigation of a Backpage.com "escort" advertisement[1] that was believed to depict a suspected juvenile (later identified as Girl 1) involved in prostitution. Girl 1 was a runaway from the foster care system.

The December 6, 2014 ad depicting Girl 1 stated it was for "Serious Generous Men Only" and "...to make your sinful fantasies come true!!" and the rates were $150 per half hour and $250 per full hour. The ad also stated there was a "... 2 girl nasty specials!!!" and the poster's age was 19. The images in the advertisement were of a black female wearing lingerie and posing in various positions highlighting her breasts and buttocks. The ad had a definition of entrapment listed as well as a disclaimer that stated "BY CONTACTING ME YOU AGREE THAT YOU ARE NOT AFFILIATED WITH ANY FORM OF LAW ENFORCEMENT."

Because BPD suspected the female depicted in the advertisement was a minor and being prostituted, BPD called the number listed in the advertisement and set up an undercover "date," or meeting for commercial sex, with a female who answered the telephone. The "date" was an "outcall" (wherein the "seller" of commercial sex comes to the location of the "buyer") set at the Holiday Inn Express located at 221 N. Gay Street, Room #102 in Baltimore, Maryland. BPD obtained the room and provided the address and room number to the female over the phone.

BPD established surveillance in and around the hotel and observed Girl 1 go to room #102. Once at the door, the female stopped and proceeded to leave. BPD observed her retrieve a cellular phone and speak with an unknown individual, later identified as Boyd, and state she went to the room but decided to leave. Girl 1 was taken into custody, as she was reported missing from Baltimore County and Baltimore City.

---

[1] Backpage.com is an online classified website that is commonly used by those involved in commercial sex/prostitution to advertise photographs, locations of "service," prices, and contact phone numbers. These advertisements are herein referred to as ads or postings.

1

Girl 1 was in possession of two cellular phones and numerous items from different hotels, to include a hotel receipt from a nearby hotel in Boyd's name. The phones were seized for evidence. Girl 1 confirmed to law enforcement that she was working in commercial sex, and later disclosed that her "pimp," or trafficker, was "Gotti," (Boyd) and that "Gotti" took all of the money that she earned from commercial sex.

BPD applied for and received a search warrant for the two phones recovered from Girl 1 on or about December 6, 2014. Text messages between Girl 1 and Boyd indicative of sex trafficking were recovered. The texts stated the following: "I'm done daddy," and "he's getting dressed," and were sent/received on December 6, 2014 (the same date that the above-mentioned Backpage ad was posted). Persons working under the direction of a "pimp" or trafficker commonly update the pimp on their status and refer to their pimp as "daddy." There were also numerous contacts between Girl 1 and Boyd, including a series of calls from Boyd to Girl 1 that occurred immediately after BPD encountered Girl 1 at the Holiday Inn Express.

Following Girl 1's recovery by law enforcement in December 2014, Girl 1 was eventually returned to foster care. Hours after her return, she called Boyd, who picked her up and returned her to prostitution that very day.

## IDENTIFICATION OF GIRL 2

On or about January 14, 2015, BPD was notified that a second minor female had come forward and stated that she was a victim of sex trafficking. BPD and FBI conducted a recorded interview of the second minor female herein identified as Girl 2, who was also under the age of 18. Girl 2 identified her pimp as "Gotti," later identified as Boyd, and stated that he had prostituted her as well as other females, to include Girl 1. Girl 2 stated that she told Boyd that she was 17 years old. According to Girl 2, Girl 1 had also told Boyd that she was underage.

Girl 2 stated that Boyd took photographs of her for use on Backpage.com at hotels in and around Baltimore. Boyd would choose which pictures the girls would post, and tell Girl 2 what to write. The rates were $80 for a short stay, $100 for ½ hour or $150 for a full hour. Girl 2 would use her mobile device or the one Boyd had to post the ads. Boyd would buy prepaid Vanilla cards to pay for the Backpage.com ads and give the card number to Girl 2 when she posted. Girl 2 gave Boyd all of the money she earned for prostitution, except when she hid some from him.

Many details provided by Girl 2 were corroborated by law enforcement, and BPD applied for and received an arrest warrant for Boyd on or about January 15, 2015.

## ARREST OF BOYD

In anticipation of executing the arrest warrant, on January 15, 2015, BPD placed an undercover phone call to a Backpage.com advertisement believed to be associated with the investigation and Boyd due to similar graphics and style in the advertisement with other Backpage.com advertisements previously identified. A female answered the phone call and advised the undercover officer that she was at the Best Western Plus in Elkridge, MD.

2

Prior to the established meeting time, law enforcement established surveillance of the Best Western Plus and identified a white Ford Fusion in the parking lot. The Fusion had been rented by Boyd's mother on his behalf. BPD, through the undercover officer, then placed another phone call to the number listed in the ad and informed the female from the January 15, 2015 Backpage.com ad that he was nearby. The female said to meet in room #208. The room had been rented by Boyd.

Shortly after this call, Boyd was observed exiting the lobby of the Best Western Plus. When confronted by law enforcement officers attempting to arrest him, Boyd threw his phone onto the ground in an attempt to render it inoperable. A state search warrant was obtained for the cellular telephone; however, the phone was damaged and Forensic Agents were not able to conduct a search of the phone until it was later repaired by a commercial vendor.

Pursuant to a federal search warrant issued on May 4, 2015, in the District of Maryland, the smartphone recovered during Boyd's arrest was searched. A review of emails saved on the phone showed a series of communications with Backpage.com posting and reposting advertisements for one and two girl "specials" in and around Baltimore, MD, the District of Colombia, and Atlanta, Georgia. Boyd identified himself as a pimp, or his son as son of a pimp, on a number of videos recovered from the phone.

## BOYD'S TRAFFICKING OF ADULTS

Boyd was also responsible for the trafficking of young adult females. There were a total of four young adult women recovered at the time of Boyd's arrest on January 15, 2015- two in or near room #208 (which contained indicia of prostitution such as lubricant and condoms) and two in or near Boyd's rental vehicle. These young women later informed law enforcement that Boyd was their pimp, or trafficker. Two of the women had travelled from out of state to Maryland for the purpose of engaging in prostitution. Boyd helped pay for, or arrange for, their travel. Boyd also transported these women across state lines, to Georgia, for the purpose of engaging in prostitution.

In addition, approximately a month prior, BPD encountered a fifth adult female, later identified by name and referred to herein by the initials BK, in room #520 of the Marriott Courtyard Hotel at 1000 Aliceanna Street, Baltimore, Maryland, during an undercover prostitution enforcement action wherein law enforcement responded to a backpage.com ad for commercial sex. After the undercover confirmed with BK that the amount quoted would include sex, oral sex and a body rub, BK was arrested for prostitution. BK subsequently stated that she was working as a prostitute for Boyd and that Boyd had posted her on Backpage.com on or about that date. According to the Courtyard Marriott, Room #520 had been rented by Boyd. Prior to the arranged meeting time, BPD and HSI Baltimore conducted surveillance and observed Boyd at the Courtyard Marriott. Boyd was believed to be acting in a manner consistent with other Backpage.com sex trafficking investigations where the pimp or trafficker of the prostitute will conduct surveillance of the lobby or exterior of the hotel in an attempt to detect law enforcement. When the BPD undercover arrived at the hotel, Boyd left the area.

Boyd was interviewed on January 15, 2015, after waiving his *Miranda* rights, and admitted that he had rented rooms for girls previously, but he denied knowledge of what the girls did with the rooms. Boyd stated that he had knowledge of other criminal activity to include gorilla pimps (pimps known for their violence). Boyd ultimately declined to continue with the interview when law enforcement asked him about this information.

I have reviewed the foregoing statement of facts with my attorney, understand it, agree with it, and do not wish to change any part of it. I further understand that it is included as part of my plea agreement with the government in this case.

_____
Steven B. Boyd, Jr.

I am Mr. Boyd's attorney. I have carefully reviewed the statement of facts with him.

_____
Gary E. Proctor, Esq.